IN THE

# SUPREME COURT OF JUDICATURE,

OF THE

## STATE OF NEW JERSEY,

AT SEPTEMBER TERM, 1836,

---

### DEN EX DEM. JOSEPH CLARK v. AUGUSTUS RICHARDS.

It is a settled rule, under all the British statutes of limitation, that when the statute has once begun to run, its course will not be impeded or its operation suspended by any subsequent disability. The same rule has uniformly prevailed in this State, and applies to actions on specialties and records, by the 6th and 7th *Sections* of the act of 1799, *Rev. Laws*, 411; and in suits for the recovery of real estate, by the 9th and 10th *Sections* of that act.

---

This was an action of ejectment tried before the CHIEF JUSTICE, at the April term, 1834, of the Essex Circuit. The jury rendered a verdict for the defendant. On the return of the *postea*, the plaintiff obtained a rule to show cause, why the verdict should not be set aside, and a new trial had. The following is a history of the trial at the Circuit.

" The premises in question consisted of five acres of land, situate in the township of Springfield, in the county of Essex, and State of New Jersey,—which James Clark, the grandfather of John. Clark, who was the father of the lessor, conveyed to John Clark, by deed bearing date the twenty-sixth day of March, one thousand seven hundred and ninety-six ; and of sixteen acres of land situate in the township aforesaid, adjoining to the said five acres, which John Clark, the grandfather of the lessor, conveyed to John Clark the father of the lessor, by deed bearing date the twenty-third day of March, one thousand seven hundred and ninety-eight.

Jacob Miller on the part of the plaintiff, testified that the defendant had been in possession of the sixteen acres before mnetioned, for seven or eight' years, and that he had seen the defendants' cattle and horse pasture on the said five acres, and had also seen the defendant's family get apples from the orchard on the five acres, for the use of the family of defendant. But he said, he believed that Samuel Richards, the father of defendant, owned the said five acres, and had the principal part of the fruit of the orchard on the said five acres. That the said Samuel Richards lived a mile or a mile and a half from the said five acres, and that he had seen Abraham Clark in possession of the premises four or five years. Witness lived in the neighborhood fourteen or fifteen years ago. Abraham Clark lived in the house on the premises a year or so, while he was repairing his house.

Mary Clark, the mother of the lessor and widow of John Clark, the father of lessor, on the part of the plaintiff, testified that she married John Clark, the father of the lessor, in June, seventeen hundred and ninety-six. That her husband's father's name was John, and his father's name was James. That John Clark, her husband, was in possession of the five acres before they were married; and went into possession of the sixteen acres about two years after they were married. The two deeds before mentioned for the five acres, and the sixteen acres, were produced and read in evidence on the part of the plaintiff, and then the witness Mary Clark said, these are the deeds under which my husband held the lands. He set out an orchard on

the five acre lot, shortly after we were married, and remained in possession of both lots until the last of October 1804, when he went away. Witness had several children by John Clark, her husband, and Joseph the lessor of the plaintiff, was one. Witness and her children remained in possession of premises until August 1810, when Abraham Clark entered upon the premises and turned witness and children out. Witness said, that when Abraham Clark turned her out of possession, he claimed to be the owner of the land, by the attachment, and said he had got a deed from auditors.

A deed from John Clark, the father of the lessor, bearing date the twentieth day of December 1816, to the lessor, for the premises in question, was produced and read in evidence on the part of the plaintiff. Mary Clark the witness then further said, that John Clark her husband was dead, that he died the twenty-fifth day of July 1819. That Joseph her son, the lessor of the plaintiff, was born the twenty-fourth day of December, one thousand seven hundred and ninety-eight, and was twenty-one years old the twenty-fourth day of December, one thousand eight hundred and nineteen.

It was then shown on the part of the plaintiff, that the declaration of ejectment in this cause, was entitled of May term, 1832, and served and returned to September term, 1832. Here the plaintiff rested his case, and the defendant moved the court to non-suit him, which motion was overruled.

*Mr. Dodd, attorney* for and of counsel with the defendant, opened the case on his part, and said, that in eighteen hundred and four or five, John Clark the father of the lessor of the plaintiff, absconded from his creditors and left the State of New Jersey, leaving a considerable debt due to his brother Abraham Clark. That some time after John Clark went away, Abraham Clark obtained a writ of attachment out of the Inferior Court of Common Pleas of the county of Essex, against the goods and chattels, rights and credits, monies and effects, lands and tenements of the said John Clark so absconded as aforesaid, which writ, he said, was executed on the premises in question. That proceedings were had under the said attachment. That auditors were appointed, and that in the term of June 1807,

they made their report to the court that John Clark was indebted to Abraham Clark, in the sum of five hundred and fifty-seven dollars, eighty-seven cents, and that no other person had applied to them to be admitted under the attachment, which report he said had been filed and confirmed, and judgment entered thereon, and that the auditors pursuant to law, had made a deed for the premises in question, to Abraham Clark, bearing date the eighth day of August 1808; and that under and by virtue of the auditors' deed, Abraham Clark took possession of the premises in question as aforesaid, in eighteen hundred and ten. Defendant then offered the proceedings in attachment, *pro ut* the same, whereby it appeared that the affidavit of Abraham Clark, made to found the attachment upon, was against John Clark as absconding debtor and not as a non-resident debtor; that the said affidavit appeared to be made the sixteenth January 1806, and filed 16th January 1807. That the writ of attachment was dated the twenty-third of September 1807, and returnable Thursday the twenty-second January 1808. That the auditors made their report the twenty-fifth of June 1807, and in June term, 1807, the said report was filed and confirmed. No person having applied to the court or the auditors to be admitted under the attachment, but Abraham Clark, and final judgment thereon was ordered. And David D. Crane, Aaron Coe and John Alling, the auditors were ordered to make sale of the lands attached according to law. The defendant then offered in evidence a deed from the said auditors to Abraham Clark, bearing date the eighth day of August 1808, *pro ut* the same, which was objected to and withdrawn. The defendant also offered a deed in evidence for the premises in question, from Abraham Clark to Samuel Richards, the father of the defendant, bearing date the twenty-second May 1824. This deed was offered from the book of deeds, and was objected to because, the acknowledgement did not say, that the grantor acknowledged it to be his voluntary act and deed, and the objection was sustained, and the deed rejected.

Abraham Miller on the part of the defendant, testified that he knew Abraham Clark, but not John Clark. That Abraham

Clark lived on the premises in question in 1811, that Abraham Clark then offered to sell the premises. That Abraham Clark moved into the house on the premises in question, in 1811, to repair the house where he had been living, and witness worked for him five or six weeks while he was repairing, and after the repairs were made, Abraham moved back again. He said he never knew John or the widow or children to live there or occupy the premises, and that he lived four miles off.

James Clark, on the part of the defendant, testified that he was the brother of John and Abraham. John was the youngest brother; that he went away the twenty-eighth day of October 1804, and his family remained on the premises till 1810, when Abraham Clark and the widow of John had a fly-round. My father then told me to get the children of John and bring them to his house, and I took them there, where they remained till 1813. Abraham Clark took possession of the premises in question, in 1811. John's wife went to her brother's, and Abraham moved into the house on the sixteen acres, Abraham claimed by the auditors' deed and not otherwise. Abraham Clark had possession of the premises until he sold to Samuel Richards. Samuel Richards was in possession of the five acres. John Clark went to Ohio in 1804, the first letter from him was in 1808; before the letter we heard he had been killed. I heard that John was on Long Island, a soldier in 1814. Father died in April 1814. John was sent to the State Prison twice. Abraham Clark knew that John was going away to Ohio in October 1804. He swopped horses with him for that purpose. I knew he was going away also. After John's wife went out in 1810, the horses and cattle of Abraham and father, run on the premises together. While the children were at the old man's, and the premises and the old man's land adjoining were open, the horses and cattle of Abraham and the old man, run there together.

Jacob Miller called again for plaintiff, said, that Samuel Richards, Jr. lived in New York, and that he heard it talked in the neighborhood that John was going away, some time before he went in October 1804.

Den ex dem. Clark *v.* Richards.

The plaintiff offered to prove that John Clark did not abscond from his creditors, but went away on the twenty-eighth October 1804, as before stated, openly and publicly, with knowledge of Abraham Clark, his father, and all the neighborhood, and that Abraham Clark assisted John Clark to get ready to go, and knew that he was going to Ohio to remain there without any expectation of his returning to this State again. This was objected to on the part of the defendant, and the same rejected by the court.

Asa Whitehead on the part of the defendant, testified that it was the practice to record the proceedings and make a regular judgment in cases commenced by attachment. That this practice was pursued in the time of his father and had been ever since. ‘ That the practice began in the time of Silas Condit. Here the testimony was closed on both sides. And the CHIEF JUSTICE, who tried the cause, after counsel had summed up on both sides, charged the jury as follows.

That there ought to be no difference made between the construction of our statute of limitations, and the English statute, on the subject of real estate, and the right of entry therein. And the proviso in the 10th Section of our statute did not alter the case. That when the statute of limitations once began to run, it run over all subsequent disabilities; and that if the jury believed that Abraham Clark, under whom the defendant claimed, when he entered upon the premises in question, in August, eighteen hundred and ten, set up and claimed title for himself, no matter whether by force, fraud or other means, then the jury ought to find for the defendant. That if they believe, that Abraham Clark, when he entered upon the premises in question, in August, eighteen hundred and ten, set up and claimed title thereto for himself, then notwithstanding twenty years had not elapsed, after the entry of the said Abraham and before the commencement of the action, excluding the time that the lessor of the plaintiff was under the age of twenty-one years, still the plaintiff was barred by the statute of limitations, and it was their duty to find for the defendant.

*Scudder,* for plaintiff.

*Dodd and Williamson, contra.*

Den ex dem. Clark *v.* Richards.

HORNBLOWER, C. J. The premises in question, formerly belonged to John Clark, the father of the lessor of the plaintiff. Sometime prior to the year 1808, an attachment was sued out against the said John Clark as an absconding debtor; and in the year 1808, or in 1810, Abraham Clark, under whom the defendant claims, entered, in virtue, or at least, under colour of a deed to him from the auditors in that attachment. On the 20th December 1816, John Clark, then out of possession, made a deed of gift of the premises, to his son Joseph Clark, the lessor of the plaintiff. Joseph, at that time, was a minor, and so continued until the 24th December 1819, a period of nearly three years, when he attained his full age. This action was commenced in September 1832; nearly thirteen years after he came of age; about sixteen years after his father gave him a deed; and twenty-four years after Abraham Clark entered, if such entry, was in 1808; but only twenty-two years, if Abraham Clark did not enter until 1810. On the trial, it was contended for the plaintiff; 1st. That the proceedings under the attachment, were fraudulent and void; and that no title passed to Abraham Clark by virtue of the auditors' deed. 2d. That the possession of Abraham Clark did not commence until the year 1810 : and 3d. That if so, then the plaintiff was not barred by the statute of limitations, as he had been under the disability of infancy, for a period of three years since his title accrued; which deducted from the twenty-two years, left but nineteen years of adverse possession, exclusive of the time during which the plaintiff had been under such disability. Had the simple question of fact, whether Abraham Clark entered in 1808, or in 1810, been submitted to the jury, I should think the verdict, ought to stand; because there was evidence on both sides in relation to that matter. But, the jury were instructed, that under the circumstances of this case, if the defendant, and those under whom he claimed, had been twenty years in possession, before this action was instituted, the plaintiff was barred by the statute of limitations. If therefore the jury paid any attention to the charge of the court, which we must presume they did, they had no occasion to decide the question, whether Abraham Clark entered, in 1808, or in 1810: since in either case, more

than twenty years had elapsed before the commencement of this suit.

The question then arises : was the law on this point, correctly stated to the jury ?   And whether it was, or not, depends upon the construction to be given to the 9th and 10th *Sections* of our statute for the limitation of actions, passed in 1799, and to be found in *Rev. Laws*, 411.

There would be no room to doubt on this point, but for the difference between the language of our statute, and that employed in the 21 *Jac.* 1 *C.* 16, *Section* 2.   Since, it is a settled rule, under *all* the British statutes of limitation, that when the statute has once began to run, its course will not be impeded, or its operation suspended, by any subsequent disability.  *Blanshard's treat. on stat. of Lim. fol.* 19 *in marg.*

The same rule has uniformly prevailed in this State, and must still prevail, unless a new one has been introduced, in regard to actions on *specialties* and *records*, by the 6th and 7th *Sections* of the act of 1799: and in suits for the recovery of *real estate*, by the 9th and 10th *Sections* of that act.   The late Mr. GRIFFITH in the 4th  *vol.* of the *Law Reg.* 1267, *in note*, after stating the rule of construction under the statute of 21 *Jac.* 2, to be as I have just mentioned, says, " but in respect of actions for real estate, this rule, since January 1st, 1803," (the period fixed by the 10th *Section* of the act of 1799, when that section should take effect,) " has not prevailed in New Jersey."   The learned author, then proceeds to comment upon the provisions of that act, as introducing a new doctrine; and supposes that after the statute has commenced running, its progress may be arrested by every occurring disability, so that no action can be barred, until the full period of twenty years of unobstructed time, has accumulated, by adding together the intermediate periods, during which no disability existed.   Or in other words, that a suit may be brought, fifty or hundred years after the cause of action first accrued, if deducting from that time, all the periods of disability by reason of infancy, coverture and insanity, that may have intervened, it does not appear, that the days, months and years, during which no disability existed, amount, altogether to twenty years.   Taking

,his to be the true construction of the act, the author justly remarks, that " it may well be doubted whether Mr. PATERSON improved upon the English law, in making the change;" and he adds, with great propriety, " it is a most important one." The unqualified assumption of Mr. GRIFFITH, that such is the rule introduced by the act of 1799, in relation to suits on specialties and records, and for lands, recollecting his usual accuracy and extensive professional experience, led me to suppose there had been some decisions of this court, settling such a construction of the act; but I can find none in our Reports, nor can I learn from the Bar that any such has been made.

It is certainly remarkable that Judge PATERSON, who (is supposed to have penned the statute in question) should have departed so signally from the language used in the 4th *Section* of the same statute, and in the 2d *Section* of the act of 1787, *Rev. Laws*, 80, both of which follow the language of 21 *Jac.* 1, unless he intended to introduce a new principle. And if such was his intention, we may be permitted, with Mr. GRIFFITH, to express our astonishment, that he ventured " to introduce so novel and hazardous a change in our law of limitations;" and if such was not his intention, then, we may be equally surprised, that " attached as he was to the principles of adhering to ancient law and statutes, '*even to the letter,*'" he should depart from the well settled language of our own and the British statutes of limitation; thereby throwing open the door of disputation, and letting in a flood of uncertainty upon long enjoyed titles and possessions.

If such is the meaning and sound construction of this act, it cannot be called "a statute of repose." It must in many cases defeat its own benevolent design. Instead of quieting possessions and estates, it will invite to litigation. Persons and property will be exposed to latent and long dormant claims, to be sustained or defeated, by the result of expensive, and after all, unsatisfactory inquiry into the histories of individuals and families, for half a century or more; and separating their days, months and years of ability to sue, from those in which they were under some statute disability. Take for instance the case

before us; suppose Joseph Clark, the lessor of the plaintiff nineteen years after his title accrued, had died, leaving an infant daughter, a few months old—at the age of eighteen or nineteen she marries, and continues under coverture for thirty or forty years, and then dies, casting a descent on minor heirs, or married daughters, who may remain under disabilities for as many years afterwards! In short, we need not imagine any unusual dispensations of Providence, to furnish cases in which a whole century may roll around, before the statute could afford any protection. A few years more, and John Clark himself would have been effectually barred; and yet under the construction contended for, he could at the last moment, by his own voluntary act, resuscitate his already expiring claim, and give it new vitality and vigor for twenty years; nay, for an indefinite period, by simply making a conveyance to an infant child. Must we do such injustice to the penman of the statute, as to suppose that he intended to introduce a rule, so novel, so destructive to the very design of the institution itself, and so hostile to the admired and favoured maxim of the law, " *interest reipublicæ ut sit finis litium?*" And that too, not only in regard to *real estate,* but in respect to *personal* actions on specialties and records?

The words in the saving clauses of the 6th and 7th Sections relating to actions on specialties and records, are precisely the same, as in the 9th and 10th Sections concerning real estate; and if the doctrine of cumulative disabilities, is to be derived from the latter, the same doctrine must be applicable to the former; and then we have the startling proposition, that the obligee, or assignee of a bond almost barred by the statute of limitations, may suspend its operation for an indefinite period, by a voluntary assignment of the bond to an infant, or a feme covert.

The settled rule under all the English statutes of limitation, and under the first three Sections of our own act, is that if *the person* to whom the right of entry or of action *first* accrues, is *at the time* when such right accrues, under any of the disabilities named in the statute, the statute does not begin to run against him, until the disability is removed : but the moment

Den ex dem. Clark *v.* Richards.

such disability ceases, the statute is called into operation, and no subsequent event will arrest its course. This rule was perfectly familiar to the mind of the learned jurist who revised our statutes ; and if he intended to break it down, and set up in its place, the monstrous doctrine of cumulative disabilities, I think he would have done so, in express, or at least in plainer terms. If such had been his design, nothing would have been more natural than for him to have said in the saving clause, "that the time during which the person having such right of action, *his heirs or assigns*, shall have been under age, &c." But this is not the language of the act : the saving is only in favour of *the person*, and that *person*, I think I shall be able to show, is *the one*, to whom the right of action first accrued. The first clause of the 10th Section declares that every action for lands, shall be instituted within twenty years, after the right or title thereto, or cause of such action shall acrue; and then it is added, "that the time during which *the person* who shall have such right or title, shall have been under the age of, &c., shall not be computed as part of the said limited period, &c." Now to an ordinary reader of this statute, I should suppose, *the person*, spoken of here, would be understood to mean, *the person* to whom such right or title or cause of action *had accrued;* and not the person, or any person, to whom the right of action might afterwards, descend or be transferred.

Upon a careful comparison, the difference between the language of 21 *Jac.* 1, and that of our statute, is not so material, as has been supposed. The only substantial difference between the two statutes, I think is this : that by the former, the time when the disability which is to suspend the operation of the statute, is to exist, is specified, namely, it must exist, *when* the cause of action *first* accrued. For the words, "first descended, accrued, &c.," do not refer to, and are not descriptive of, *the person*, who is to be saved from the operation of the statute; but they relate to, and are descriptive of, *the disability*, which is to save from its operation, by fixing the period *when*, that *disability* must exist; namely, *when* the right of action *first accrued*, and not that, which may occur at any time afterwards. But *the person* in whose favour such suspension is to operate,

is altogether matter of construction—and yet under that statute it has uniformly been held, that the saving clause does not extend to any person, but the one to whom the right of entry or of action *first* accrued; and that if the statute has once commenced running against him, it runs over all subsequent disabilities. Whereas, our statute, more distinctly designates *the person* in whose favour the saving clause is made, but does not, (in terms, at least,) confine its influence to disabilities existing *when* the cause of action accrued. What I mean is this : that the saving clause in the British statute, is not in terms limited *to the person*, to whom the right of action, *first* accrues; but it is made in favour of him and him only, who was under disability, *when* the right of action *first* accrued *to him;* whoever he may be; whether, *the person*, who first acquired the right of action, or *one*, to whom it has descended or been transferred. The language of that statute is, "that if any person, "who shall *have*" a right or title of entry, shall be, *at the time*, such right first accrued, &c. within the age of twenty-one, &c. then, &c." This evidently means, that if any person, *when*, the right first descended or accrued, *to him*, be under disability, &c. It surely does not mean, that if any person who shall have a right of action, shall be under disability, at the time, such right *first* accrued to his ancestor or grantor, then that the period of such disability shall not be computed against *him*. Such a saving would be unmeaning and nugatory. I have been thus particular in my remarks upon the statute of 21 *Jac.* 1, because upon the argument, that statute was cited as if, in very terms, the saving clause was limited to *the person* to whom the right of action *first* accrued; instead of which, it only gives a saving effect to such disabilities as existed at a particular period; to wit, at the time when the right of action first accrued, to the person claiming it. The question, who is the *person* that may claim the benefit of the saving clause, was as much a question of construction under the British statute, as it is under ours. Good policy—sound legal discernment and the spirit of the maxim, I have already quoted, led the courts of Westminster Hall, long since to determine, that *the person* to whom the right *first* descended or accrued, was

alone, within the saving clause of the statute. That if a right of entry accrued to A, and he was under no disability at the time, the statute instantly commenced its course, and would not be interrupted by any subsequent disabilities, either in him, or in any person to whom the right might descend, from, or be transferred, by him.

So long therefore as I do not find myself bound either by the terms of our statute, or by any decision of this court to the contrary, I must adopt the construction given to the 21 *Jac.* 1, at least so far as respects *the person entitled* to the benefit of the saving clause. That person in the present case, was John Clark. The action *accrued*, (if it ever did accrue) to him; not to the lessor of the plaintiff. The moment Abraham Clark entered and took possession of the premises, the right, title and cause of action accrued to John Clark. To *him* the statute immediately addressed itself, and *he* was the person against whom any period of disability should not be computed. But he was under no disability at that time or at any time afterwards, until he *voluntarily* parted with his right of action. The statute then, commenced running against *him*, and against *his* right of action; and more than twenty years having elapsed before this suit was brought, it is barred by the statute.

This is all that is necessary to be determined for the decision of this cause. Whether, if John Clark had been under disability when the cause of action arose, and had continued so until his death; and the right had then descended to an infant heir, or a feme covert, the statute would not have been postponed, until the right of action vested in some person capable of suing: or whether if John Clark was under no disability when his right of action accrued, but afterwards became insane, the period of his insanity, ought not be excluded, under the peculiar phraseology of our statute, are questions, which need not *now* be settled. But whatever may hereafter be decided upon those points, I cannot believe that the framers of the statute, intended that a person might have a right of action upon a bond, or a record, or a right of entry into lands, and retain that right, unasserted for nineteen years and eleven months, and then by contracting marriage, or by a voluntary

Den ex. dem. Clark *v.* Richards.

assignment or conveyance to a minor or feme covert, protract and continue the right of action, for an indefinite period. Such a construction would be repugnant to the name, nature, and design of the statute itself. It would be better, far better, to have no statute at all; for then the courts might quiet law suits and possessions, upon the common law doctrine of presumptions.

I am aware that it is no difficult task for a brilliant imagination, strongly to excite our sympathies, as has been done in this case, in behalf of the unhappy woman whose intoxicated and brutalized husband neglects to prosecute her claims; or the helpless and unprotected orphan, or the still more wretched and miserable lunatic. But, the same sprightly imagination could be at no loss for materials from which to give us an equally soul stirring picture, of the thousand unfortunate victims, who under the doctrine of cumulative disabilities, may be turned out, *houseless* and *homeless*, from the dwellings of their fathers, or the lands they have bought in good faith, and which have been paid for, improved, and adorned, by the labour of their hands, and the sweat of their brows.

In short, the construction contended for, is contrary to the policy of the law and the spirit of the times in which we live. Much of the prosperity of our country, is owing to the facility with which real estate is permitted to change owners, and the security afforded, by the quieting influence of the statute of limitations. Every thing therefore that would impede the transfer of land, or hang doubt and uncertainty upon the validity of its title, would depreciate its value, and retard the improvements of our country. But however that may be, I am very much inclined to believe with the learned and lamented Judge GRIFFITH, that "it will be found in the end, that all exceptions ought to be abolished: and that twenty years of adverse possession, should be a bar against all the world. "Imprisonment," he remarks, "and beyond seas, have been discarded, and such now are the means and capacities which infants, feme coverts and insane persons, possess to have their rights asserted within twenty years, that it may well be doubted whether much greater injury does not flow from

Den ex dem. Clark v. Richards.

keeping up these savings, then would follow from the bare possibility, that now and then, a person might suffer from such incapacity."

In my opinion, the rule to show cause ought to be discharged with costs.

*Note:* after the foregoing opinion had been pronounced, my attention was directed to the case of *Den ex dem. West and al.* v. *Pine and al.* 4 *Wash. Cir. C. R.* 691,4. In which, Judge WASHINGTON says, in his charge to the jury, that "The act of 1799, may be dismissed, with a single observation, which is, that if this be the only act, which is to govern the case, it does not operate as a bar to this suit; inasmuch as twenty years have not run from the time, when the right of Joseph West accrued, to the bringing of this suit, *after deducting the years during which the 2d Joseph West and his children, the lessors of the plaintiff, were under the disability of infancy.* That this deduction is to be made according to the true construction of this act, *we understand to be conceded,* by the defendants counsel; and indeed we do not see any satisfactory ground, upon which a different construction can be maintained." The learned judge then proceeds to show, that the act of 1787 was not repealed by that of 1799, and that the plaintiffs were barred by the operation of the former.

The deliberate opinion of that distinguished judge, directly on the point, in a case necessarily involving the construction of the act of 1799, would have a very commanding influence on my mind. But it is manifest that the remarks above quoted, were not the result of much reflection. He had understood the counsel, as conceding the point, and it was not necessary to settle the construction of the act, for the determination of that cause. I see therefore nothing in the case to shake my confidence in the opinion delivered.

RYERSON, J. The great question in this cause, relates to the construction of our statute of limitation.

By the act, *Rev. Laws,* 411, *Section* 9,10, the right of entry into lands is taken away, and all actions for the recovery thereof, barred by the lapse of twenty years. To these sections are

annexed provisoes—" That the time during which the person who hath, or shall have such right or title of entry, (or such right or title, or cause of action) shall have been under the age of twenty-one years, feme covert, or insane, shall not be taken or computed as part of the said limited period of twenty years." These provisoes it will be observed, are clothed in very different language from that of the statute, 21 *Jac.* 1 on the same subject. In the English statute, disabilities existing at the time of the right, or cause of action first accrued, are alone recognized; and that too by the express words of the statute. Hence no subsequent, successive, or cumulative disabilities are allowed in its construction. *Cru. Dig. 3d vol. Tit. 31. Ch.* 2, *sec.* 50, 51, *&c; Doe* v. *Jones*, 4*th Term*, *R.* 300; *Demarest* v. *Wynkoop*, 3 *John. Ch. R.* 129. And whenever the limited period has begun to run, it is not arrested by the happening of any of the disabilities mentioned in the statute. But the language and structure of our statute, are so far variant as at least to render plausible the position that an entirely different rule was intended. This seems to deprive us of the aid ordinarily derived from English jurists, in settling the construction of our statute. The privation is the more severely felt, as no assistance can be derived from adjudications in sister States, to which I have had access. In most of the States, their enactments differ in their phraseology so much from ours, so far as this point is concerned, that all the decisions seem alike inapplicable. There is one point however, in which all the adjudications to which I have had access, on this subject, closely resemble each other. This is the strong disposition manifested, to give efficacy to the statutes, and not to extend their exceptions by construction. The *peace* of *society* is not alone concerned: but the due cultivation and improvement of our lands, so much dependent, in *this* country at least, on a quiet title, is also an object of very great private and public interest.

What meaning then, are we to affix to our statute ? Who are to possess the protection of its saving clauses ? Is it to be confined to one person, or a dormant claim left to " travel through minorities for two centuries," or more ? And again, is a female claimant not only to be allowed to strike out of the

account her twenty years of non-age, but also her some forty, fifty, or even sixty years of coverture, and transmit this dormant claim to her heirs, to remain in full force in their hands for the entire period of twenty years allowed by the statute? And when at the close of nineteen years, time and the statute are about to shed their tranquilizing influence over the parties and their titles, shall the death of one, and a descent of his right on his infant heir, suspend the whole process for at least twenty years more? Nay, what is still more intolerable, and nearer to the case before the court, shall a man against whom the statute has *almost* completed a bar, by a voluntary conveyance to some infant member of his family, child or grandchild, wholly defeat the object of the legislature, for any period of time, not exceeding an entire minority, which he thinks proper? These questions present themselves under the plaintiff's construction of the statute. They are certainly important, if not difficult.

But after the most mature consideration which I am capable of giving this subject, I conclude, that the words in the proviso, " The person who hath, or shall have such right," &c. must be restricted to the person who had it, when the cause of action or right of entry first accrued. The statute (in the enacting clause,) never could have been intended to mean, (and has never been so construed) that *any* and *every* person successively who might acquire a right of entry, by descent or purchase, should have his twenty years in which to make his entry or bring his action. The words have always been restricted, and without a shadow of doubt, as to the correctness, to the person to whom the right *first* accrued. Not that *every* person to whom it may subsequently come by *descent* or *purchase*, shall have the twenty years from the time it first accrued to him. If a man be dispossessed of lands and remain out of possession ten years, and then claim his right, or dying cast it on his heir, by this descent or alienation, a right of entry, or of action hath accrued to the alienee, or heir. And the general language of the statute would seem at first not to prohibit his entry at any time within twenty years from his acquisition. But this has never been held the true meaning. But the enacting clause, is quite as

broad and general in its terms, as is the proviso. If the former is to be restricted in its terms, why not the latter? By " the person who hath such right or title," in the proviso, should be understood, *the person who first hath* it, who was ousted or dispossessed, and not he or they to whom the dormant right may be aliened, or descend. It is the *claimant,* and the situation of the claimant, to whom the cause of action or of entry originally arose, to whom, and which, the statute in both its sections and their provisoes, hath regard, and to none other who may have become interested by operation of law, or the merely voluntary action of the parties. In fact, the utter injustice and departure from the spirit of the statute, resulting from the allowance of a disability voluntarily interposed, raises a strong presumption, that no interpretation of the proviso, of which that would be the consequence, can be true, or in accordance with the intention of the legislature. The statute is too general to admit of a distinction between voluntary, and involuntary disabilities, unless by merely judicial legislation, which ought not at this day, to receive the sanction of the court. Again, it may be observed, the proviso is in the singular number. But one person, according to its literal reading, is allowed his non-age, or other disability. The words are, " the person," *and not the person or persons* " who hath or shall have such right," &c. May we not thence infer, that the design of the legislature was, to extend the operation of the proviso to a single person, and not to a succession of persons? Nor does the proviso of the act employ the language, *the person,* his *heirs* or *assigns,* or any equivalent expression; which certainly would be very appropriate, if not necessary, if it were intended to embrace such succession of persons within the same. And the constant practice of the legislature of multiplying words, to express more fully their meaning, even in cases of less necessity than the present, strengthens the argument, that in this case there did not exist such intention, which additional words might have been appropriately employed to communicate. (*Vide* our acts of Assembly, *passim.*) I conclude therefore, that in enacting the statute in question, our legislature had in their view, the disability of one person only, the person ousted,

Den ex dem. Clark *v.* Richards.

or to whom the cause of action, or right of entry first accrued. It may also be observed, although not necessary to the decision of the cause, or the point in question, that it would *seem* to result from this mode of viewing the subject, that the disability to be regarded, is only such as existed at the time the right of action or of entry first accrued, to the exclusion of all subsequent, or cumulative disabilities. This however, is a mere suggestion not a settled opinion.

It seems our statute has now existed for more than thirty-seven years without any judicial construction of its novel language. At least I have heard of none, except some recent opinions at *Nisi Prius,* given more to bring up the question, than to declare the law. This not only adds to the embarrassment, but to the responsibility, of the judgment now to be pronounced. Mr. GRIFFITH in his *Law Register,* 4th *volume,* 1268,9, has noticed the peculiarity of the language. He has also given an opinion on its construction, from which however, I am constrained to differ. He expressed his *wonder,* that Judge PATERSON, the penman of the statute, " ventured to introduce so novel and hazardous a change." If Judge GRIFFITH be right in his view of the statute, that all disabilities, successive, cumulative, and voluntary, are entitled to the protection of the saving clauses, Judge PATERSON, and all concerned in its passage, are indeed to be wondered at. But if they meant no such change in the law, but only to simplify its language, the wonder is at an end.

I can, on the whole, find no error in the instruction given to the jury, involving this question. And this conclusion, renders it unnecessary to look into the other questions, discussed at the bar of the court. The rule to show cause, &c. must be discharged, with costs.

FORD, J. In the year 1796, John Clark became seized in fee simple of a house and five acres of land, and occupied them from thence until the year 1804; he then absconded, leaving his wife and children in possession, and they continued on the place, after he left them, peaceably, until the year 1810, when Abraham Clark made a forcible entry, turned out the wife and children, and began an adverse possession. This he transferred

to Samuel Richards, and Samuel transferred it to Augustus Richards the present defendant, who had, at the time this action was commenced against him, a possession of twenty-two years adversely to the title of John Clark. This John Clark never returned to his family, but by his deed of the 20th of December 1816, for valuable consideration, he sold and conveyed the said premises to his son Joseph Clark, a minor under the age of twenty-one years; he was born the 24th of December 1798, and at the time of his purchase was eighteen years old and no more. By this deed he acquired the legal title to the land, and had an immediate right to enter and maintain an ejectment. But he delayed to sue; he did not bring the present action till May term, 1832, by which time Augustus Richards, and those under whom he claims, had been in adverse and peaceable possession for a period of twenty-two years. And the defendant sets up the statute of limitations as a bar to the plaintiff's action. The statute enacts, " That no person who hath or shall have any right or title of entry into any lands, shall make any entry therein, but within twenty years next after such right or title shall accrue, and such person shall be barred from any entry afterwards." *Rev. Laws*, 411, *sec.* 9. But the plaintiff claims a deduction of *three* years, for the time he was under age, leaving, instead of twenty-two, only nineteen years of adverse possession; whereas the statute requires twenty full years to constitute a bar. The proviso in the above statute is, *" that the time, during which the person, who hath or shall have such right or title of entry, shall have been under the age of twenty-one years, feme covert, or insane, shall not be taken or computed as part of the said limited period of twenty years."*

The meaning of the act and proviso seem to me to be this: that any person who has a good title to land in the possession of another, shall enter and bring his action to enforce that title within twenty years from the time it accrued, or such title shall be barred forever, but the time during which the owner of such title may have been under age shall not be computed as any part of the said twenty years; there shall be twenty years beside it. After the utmost consideration that I can give to

this proviso, the words of it convey no other meaning to my mind. In computing the twenty years there is a certain description of time which shall not be reckoned; it is called *the time* during which the person shall have been under the age of twenty-one years ; it is the time of infancy or minority ; advantage shall not be taken of any default of an infant to sue; he is not able by law to contract or deal for himself; he wants knowledge; he is reckless ; he has no circumspection; he wants prudence and discretion; he has not come to his estate, nor the means of carrying on a lawsuit against men of age, craft and subtility; and his neglect to sue shall be pitied and forgiven rather than be punished by a forfeiture of his land.

The next question is, *whose* infancy shall not be computed as part of the said twenty years? The proviso describes him thus —"the person who SHALL HAVE such right or title of entry "; he who *hath* the right of entry when it *first* accrues, or he who *shall* have it *afterward ?* If a man of full age, sixteen years after being turned out of possession, die, and the right descends to his infant son, a child swinging in the cradle, the time of that child's infancy shall not be computed, in reckoning against him the said limited period of twenty years; for if it were otherwise, the consequence would be, either that its estate must be forfeited, or, the child must bring an ejectment before it is four years old, not knowing good from evil, or its right hand from its left. The proviso does not employ an ambiguous word, on which my utmost ingenuity can raise a doubt, nor would one ever have arisen, had it not been for the proviso in the British statute, of 21 *Jac., ch.* 16 ; and yet it is necessary only to state the statute of James, in order to see the difference between them. It runs thus: " provided, that if any person that hath or shall have such right or title of entry, be or shall be, at the time the said right or title *first* descended or accrued, within the age of twenty-one years, feme covert, non compos mentis, imprisoned, or beyond seas; then *such* person, and his heir, shall or may, notwithstanding the said twenty years be expired, bring his action or make his entry, as he might have done before this act, so as such person or his heir, shall, within ten years next after his or their full age,

discoverture, coming of sound mind, enlargement out of prison, or coming into this realm, or death, take benefit of, and sue forth the same ; and at no time after the said ten years." *Bac. Abr. Limitation of actions, B.* I will not stop to prove that our legislature had a right to vary from the British statute; nor need I stop to prove, by an elaborate comparison of the two provisoes, that. they did vary from it, for they are so utterly unlike as to have little or no similarity.    The British proviso has a saving for persons *imprisoned*, or *beyond seas*, whereas our's has none for either of them.    One allows only ten years after the first imbecility shall have ceased, ours deduct the whole time of imbecility, and no more, from twenty years. But there is another variance greater than all the rest.    The British proviso saved none other, by its express words, than the person to whom the right of entry " *first accrued*."    If that *first* person lay under no disability, the statute began to run.    If by his unfortunate death, the right of entry descended to an infant, a lunatic or feme covert, the statute paid no regard to the incapacity of these secondary persons ; the poor infant was left to bring an ejectment before it could tell its name ; no pity for a heaven-struck lunatic ; if a married woman could not persuade her drunken or brutal husband to go to law for her estate, it was barred ; once the British statute began to run, it pursued its reckless course, like the car of Juggernaut and crushed infants, lunatics and married women as unpitied victims if they lay in its way.    But when our legislature came to revise that statute, the words " *first accrued* " were entirely abolished, so that the proviso should extend to " *the person who hath, or shall have, the right of entry*," and if such person, (without distinction of first or second to whom the right accrued,) be an infant, lunatic or feme covert, the time during which he or she was such, shall not be computed as any part of the limited period of twenty years.

The statute of James uses the word " *first* " accrued.    If the person to whom the right of action *first* accrued was under a disability, that proviso saved *him ;* but the word let in none subsequent to him.    It was impossible for a subsequent one to be the *first*, and therefore impossible to save him under that

Den ex dem. Clark *v.* Richards.

proviso. If the *first* was under no disability the statute began to run against him, the instant the cause of action accrued to him. If he died the next day, leaving his son and heir not a week old, the infant would not be the *first* to whom the right of action accrued, for his father had it before him ; and therefore it was held that the infant could not take the benefit of the proviso ; he was not within the letter or meaning, which applied to none but the first ; and on this ground it became a settled rule, that if the statute once began to run, it did not stop again for disabilities subsequent to the first, but run over and disregarded them all. Idiots, lunatics, and married women, were left to forfeiture in the same manner ; the will of the former to sue for their rights being denied to them by the act of God, and taken away from married women by the act of the law itself, yet that merciless proviso afforded them no relief. This rule, that when the statute of James once began to run, it could not stop for any subsequent disabilities, must have been well known by that able civilian who was entrusted to revise the British statutes, as well as that it unavoidably resulted from the all potent word "*first*," in that proviso. To suppose that great man was ignorant of the English rule, and of the remarkable word on which the harshness of it depended, would be a gratuitous calumny, which no person of that generation would harbor in his mind ; it would extend also to several learned jurists who had seats in the legislature at the time of the revision. The casting away of that potent word, and introducing nothing instead of it into our proviso, shows an intent of the legislature that the English rule, and the very foundation on which it rested, should be done away. No attempt was made to amend the English proviso in form or substance ; they discarded it altogether, and drew one entirely anew, admirable for conciseness, simplicity and accuracy, extending its benefits to every owner equally, while under a disability to sue. The time of infancy under the English proviso, *was* computed in all cases save one ; our proviso is that the time of infancy *shall not* be computed in any case, and I am bound to adhere to the written law of the State, even if I deemed it an inexpedient one. Admit that a female infant, having the right of entry,

becomes a feme covert before she is twenty-one, and dying, after a long life, transmits the right of entry again to an infant heir ; the greatest hardship of their successive incapacities to sue, falls *on themselves ;* they lose the enjoyment of a lawful estate, and a natural decay takes place during the whole time, of the evidences of their title, and multiplies the chances in favor of the wrong-doer, who takes, in the mean time, all the profits of their land, without a scrap of title or right.    If the magnitude of the evil were greater to a wrong-doer, and to those claiming under him, than it is, the enormous evil the other way would have to be incurred, viz : that the public law should deprive a poor muttering lunatic, for instance, of his *rightful* estate, not for any crime, but merely because the providence of God will not give him the sense to sue for it. The legislature must have weighed every word of this proviso with more than ordinary care, as they employed the same words, four times running, to qualify four successive sections, by repeating them over, at the end of each one, in this same act.    If we adopt the English rule, that, when the statute once begins to run, no disability arising afterward, can stop it, we shall contravene, as it appears to me, every word in the proviso. Suppose this John Clark, on hearing that his wife and children were turned out of doors, into the street, had become *insane ;* and after being so twenty years, had recovered his senses ; the proviso says that " the time during which the person (who hath the right of entry) shall have been insane, shall *not* be computed ; a judicial decision that it *shall* be computed, repels the statute in express terms.    A statute may not be resisted (except it be unconstitutional) for any reason whatever, much less because another country has a different rule that is supposed to be better.

On the whole case, Joseph Clark is the *bona fide owner* of the land, unless his title is barred by length of time ; but as the time of his *infancy* cannot be computed against him under the proviso, there is not enough time without it to make out the twenty years, therefore there ought to be a new trial.    Then if the defendant really has a title under the *attachment,* he will have another opportunity to show it ; and I am fully

Den *v.* Westbrook and al.

satisfied that the *minutes* of a court are competent evidence of their proceedings in *attachment.*

*Rule discharged.*

CITED in *Thorpe* v. *Corwin, Spencer,* 314 ; *Howell* v. *Howell, Id.* 413 ; *Pinckney* v. *Burrage,* 2 *Vr.* 26.